FILED
2016 Nov-17  AM 08:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHNATHAN AUSTIN, RANDALL WOODFIN, JAMES CLARK, DARRELL O'QUINN, AMIE EVANS, MERRIAM MCLENDON, SHIRLEY ELLIS, and JACQUES LOVEJOY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 2:15-cv-01777-JEO |
| ALABAMA DEPARTMENT OF TRANSPORTATION; JOHN R. COOPER, Director, ALDOT; FEDERAL HIGHWAY ADMINISTRATION; and MARK BARTLETT, Division Administrator, FHWA, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## REVISED MEMORANDUM OPINION

In this action for declaratory and injunctive relief, eight individuals (collectively, the "Plaintiffs") bring claims against the Alabama Department of Transportation and Director John Cooper (collectively, "ALDOT") and the Federal Highway Administration and Division Administrator Mark Bartlett (collectively, the "FHWA") for alleged violations of the National Environmental Policy Act, 42

U.S.C. § 4321 et seq. ("NEPA").[1]   The Plaintiffs allege that ALDOT and the FHWA (collectively, the "Agencies") violated NEPA in their assessment of the environmental impact of the I-59/20 Corridor Improvements Project in Jefferson County, Alabama (the "Project").  They allege that the Agencies violated NEPA by preparing an allegedly deficient Environmental Assessment for the Project and by finding that the Project will have no significant impact on the environment, obviating the need for an Environmental Impact Statement.  Among other relief, the Plaintiffs seek a permanent injunction enjoining the Agencies from taking further action on the Project until they have prepared an Environmental Impact Statement.

Before the court are (1) the Plaintiffs' motion for summary judgment (Doc. 40), (2) ALDOT's motion to dismiss for lack of standing or, in the alternative, cross-motion for summary judgment (Doc. 46), and (3) the FHWA's cross-motion for summary judgment (Doc. 48).  The motions have been fully briefed by the parties.  (Docs. 41, 47, 48-1, 51, 52 & 53).  For the reasons that follow, ALDOT's motion to dismiss will be denied, the Plaintiffs' motion for summary judgment will also be denied, and the cross-motions for summary judgment by ALDOT and the FHWA will be granted.

---

[1] In the court's original Memorandum Opinion, the court inadvertently referred to NEPA as the "National Environmental Protection Act." The opinion has been revised to reflect NEPA's correct title, the "National Environmental Policy Act." No other revisions to the Memorandum Opinion have been made.

## I.  THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  The dual purposes of NEPA are: "(1) ensuring that agency attention will be focused on the probable environmental consequences of the [agency's] proposed action and (2) assuring the public that the agency has considered environmental concerns in its decision making process."  *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990) (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97–98 (1983) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).  NEPA established the Council on Environmental Quality ("CEQ"), which has promulgated regulations to govern federal agency NEPA compliance. 42 U.S.C. § 4342; *see* 40 C.F.R. §§ 1500.1-1517.7; *Robertson*, 490 U.S. at 354.  The CEQ regulations are entitled to substantial deference. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 372 (1989).

NEPA requires a federal agency to take a "hard look" at the environmental consequences of its proposed action.  *Robertson,* 490 U.S. at 350.  NEPA is not, however, "a substantive environmental statute which dictates a particular outcome if certain consequences exist," but rather is a procedural statute that creates "a particular bureaucratic decisionmaking process."  *Sierra Club v. U.S. Army Corps*

*of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002) (quotation marks and citation omitted); 40 C.F.R. § 1508.21.

NEPA allows for three levels of detail in analyzing a project's impacts: an environmental impact statement ("EIS"), an environmental assessment ("EA"), or a categorical exclusion ("CE").  An EIS is required before a federal agency undertakes any "major" federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  If an agency expects an action will cause significant impacts, it can prepare an EIS directly. *See* 40 C.F.R. §§ 1502.9, 1503.1(a).

If an agency cannot predict whether a proposed action may cause a significant impact on the environment, the agency may prepare an EA to help it reach a conclusion on the significance of the impacts.  40 C.F.R. §§ 1501.4, 1508.9. An EA is a "more limited" document than an EIS. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).  A "brief and concise" EA satisfies NEPA if it "contain[s] sufficient evidence and analysis for the agency to determine . . . whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an [EIS]."  *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996) (quotation marks and citation omitted).  If, upon reviewing the EA, the agency determines that the action's effects will not be

4

significant, it can issue a "finding of no significant impact" and proceed without preparing an EIS. 40 C.F.R. § 1508.13.

Finally, agencies can comply with NEPA without completing an EIS or an EA if the action fits a category that does not "individually or cumulatively have a significant effect on the human environment."  40 C.F.R. §§ 1507.3(b)(2)(ii) & 1508.4.  NEPA calls on agencies to designate certain categories of actions as CEs if experience has shown that such actions normally do not have a significant impact on the environment and they identify no "extraordinary circumstances." 40 C.F.R. §§ 1507.3(b)(2)(ii) & 1508.4.

## II. BACKGROUND

Interstate 59/20 runs east-west through the City of Birmingham's Central Business District ("CBD").  Between the Interstate 65 interchange and the Red Mountain Expressway interchange, a distance of approximately 1.25 miles, the highway is elevated on a bridge (the "CBD Bridge").  (R. 13846).[2]  Construction of the CDB Bridge began in the 1960s and was completed in 1971.  (R. 12176). The bridge is primarily a six-lane divided highway with "inconsistent travel lane widths and minimal inside and outside shoulder widths."  (R. 13846).  It was

---

[2] References to "R. __" are to the pages of the amended administrative record ("Administrative Record").  An index to the Administrative Record is located at Doc. 36-2; the record itself is located on a flash drive maintained in the Clerk's office. The pages of the Administrative Record are stamped "FHWA" followed by a seven-digit numeral, *e.g.*, "0000001."  When cited herein, however, pages do not include the "FHWA" identifier or the leading zeros.  Thus, for example, the page stamped "FHWA0013846" is cited simply as "R. 13846."

designed to carry 80,000 vehicles per day, but now carries almost 160,000.  (R. 12176).  In addition, deficiencies in the design of the bridge cause unsafe traffic "weaving" and contribute to crashes along the bridge.  (R. 13847).

In early 2011, ALDOT determined that the CDB Bridge was "rapidly deteriorating" and that replacement of the bridge decks was becoming "critical." (R. 4455).  ALDOT proposed the Project to both "address the structurally deficient bridges along I-59/20" and "improve the traffic operations and access through" the Birmingham CBD.  (R. 13847).

Initially, ALDOT contemplated a maintenance (repair) project that included replacing the bridge decks and some of the existing girders under the decks, but leaving the substructure (the columns, foundations, and footings) of the bridge in place.  (R. 1666, 13850).  For a project of that scope, ALDOT anticipated that it could use a CE to comply with NEPA, pending completion of the public involvement process.  (R. 1369).

In May and June of 2012, the City of Birmingham and Jefferson County asked ALDOT to consider replacing (rather than simply repairing) the existing CDB Bridge with a "new concrete structure."  (R. 1610-11).  The City and the County noted that "[n]ew lanes could be designed as part of a new structure, the substructure and the superstructure would be the same age and require less

maintenance, noise could be abated through downtown and the appearance of the structure could be much improved." (*Id.*)

Following a public involvement meeting and a stakeholder meeting in July 2012 (R. 1638-1733), and as requested by the City and the County, ALDOT began revising the Project to encompass replacement of the entire bridge. (R. 4999). ALDOT also began considering ways to address the appearance of the bridge, the operation of traffic on the bridge, and safety concerns associated with the traffic weaves on the bridge. (*Id.*) ALDOT's preliminary replacement design included replacing the CDB Bridge with a segmental concrete bridge, adding auxiliary lanes on the bridge, and moving all of the interstate access to and from the CBD onto a widened 11th Avenue North corridor. The design also included closing several surface streets to through-traffic beneath the bridge and modifying the I-59/20 interchanges at I-65 and 31st Street. (R. 13850).

ALDOT presented its preliminary design for replacing the CDB Bridge at a public involvement hearing in March 2013. (R. 2302-27). Over the next two years, ALDOT held a series of fourteen public involvement and community outreach meetings on the Project. (R. 13606-07). ALDOT also coordinated with the City of Birmingham on the development of the Project. (R. 4455-57, 5119-21). The Project design was modified and refined in response to this input. (*See* R. 13529-30, 13602-05, 13851).

As the design of the Project evolved, ALDOT looked at two alternatives to reconstructing the CDB Bridge in its existing location: moving the highway north to the Finley Boulevard corridor (two alternative designs), and "sinking" the section of the highway that runs through the Birmingham CBD to below street level.  (R. 5051-5109).  ALDOT retained an independent consultant to study these alternatives and assess their feasibility.  (R. 4456).  By early 2014, ALDOT had determined that both alternatives were too costly and required unacceptably long timeframes to construct, among other issues.  (R. 5058, 5071, 5099, 5104–05).

By March 2015, the design of the Project had been refined to its currently proposed form.  That month, ALDOT issued an Environmental Assessment evaluating the potential environmental consequences of the proposed Project.[3] The EA consists of a twelve-page summary supported by 283 pages of attached studies and documentation.  (R. 13845-14140.)  The EA uses a "No-Build Alternative"—leaving the CDB Bridge as it currently exists except for routine maintenance—as the "baseline condition from which to measure impacts."  (R. 13850).  The EA explains that the No-Build Alternative "will not address the structurally deficient [CDB Bridge] and will not improve the traffic operations and access through the City of Birmingham's CBD."  (*Id.*)  The EA then discusses the

---

[3] Although states set transportation priorities, federal law requires them to complete certain requirements before obtaining federal funds, including completion of the NEPA process. *See* 23 C.F.R. § 771.109; 23 U.S.C. § 139(c)(3). The United States Department of Transportation and the state entity serve as "joint lead agenc[ies]" for completing the NEPA process.  23 U.S.C. § 139(c)(3).

evolution of the "Build Alternative" and the reasons why ALDOT's initial repair design (the "First Build Alternative") and initial replacement design (the "Second Build Alternative") were removed from consideration.  (R. 13850-51).  The EA then summarizes the Build Alternative that was carried forward for full evaluation (the "Third Build Alternative"):

> The [Third Build] Alternative is the Build Alternative that has been carried forward through the NEPA process and includes replacing the [CDB Bridge] with a segmental concrete bridge and the construction of auxiliary lanes on I-59/20 from east of the I-59/20/SR 4 (Arkadelphia Road) interchange to the [Red Mountain Expressway] interchange.  The project was expanded to a point east of the I-59/20/SR 4 (Arkadelphia Road) interchange in order to add an auxiliary lane to the I-59/20/65 interchange.  To improve access to and from the Birmingham CBD[,] ramps will be constructed from 11th Avenue North to I-65 and I-59/20 and from I-65 and I-59/20 to 17th Street North.  To improve access to Fountain Heights … 15th Street North and 16th Street North will remain open to pedestrians at I-59/20.  Sidewalks along these streets will also be reconstructed beneath I-59/20 to improve pedestrian access to the CBD.  28th Street North will also remain open to accommodate vehicle and pedestrian access to the Norwood[] area businesses and the CBD. To address traffic operational deficiencies along I-59/20 in the Birmingham CBD the access ramps from 18th Street North and 22nd Street North will be removed.

(*Id.* at 13851).  The EA also includes an Environmental Assessment Checklist addressing the Project's environmental impact, permits, public involvement, and environmental commitments.  (*Id.* at 13852-55).  The FHWA concurred with the EA without comment.  (*Id.* at 13856).

ALDOT presented the Third Build Alternative at a final public design hearing on April 23, 2015, during which additional public comments were received for consideration by the design team.  (R. 11501–12155).

On June 25, 2015, the FHWA issued a Finding of No Significant Impact ("FONSI") for the Project (the Third Build Alternative with minor changes).  The FONSI is a 20-page document with six attachments that total over 300 pages (along with a copy of the EA).  (R. 13522-14140).  The FONSI imposes binding "Environmental Commitments" on the Project. (R. 13530-31).   The FONSI certifies that the Environmental Assessment "adequately addresses the socioeconomic and ecological issues related to the proposed project" and "provides sufficient evidence and analysis for determining that an Environmental Impact Statement (EIS) is not required."  (R. 13541; R. 13525).

After the FHWA issued the FONSI, the Plaintiffs filed this action, challenging both the FONSI and the preparation of the EA. The Plaintiffs are eight citizens who live within 100 yards (Plaintiff Shirley Ellis), one mile (Plaintiffs Jonathan Austin, Randall Woodfin, James Clark, Amie Evans, Merriam McClendon, and Jacques Lovejoy), and five miles (Plaintiff Darrell O'Quinn) of the Project site.  (Docs. 24 through 30 & 33-1).  Austin is Birmingham's City Council President, Woodfin is a member of the Birmingham Board of Education, and O'Quinn is the President of Crestwood Community, the Crestwood

Neighborhood Association, and the Citizens Advisory Board.[4]   Austin, Woodfin, and Clark all work within one mile of the Project; O'Quinn works within three miles of the Project.  All eight Plaintiffs have sued in their individual capacities.

The case is now before the court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  ALDOT, but not the FHWA, has also moved the court to dismiss the Plaintiffs' claims pursuant to Rule 12(b)(6) for lack of standing.  The court will first address ALDOT's motion to dismiss, and will then turn to the parties' cross-motions for summary judgment.

## III.  ALDOT'S MOTION TO DISMISS

Rule 12(b)(6) authorizes a motion to dismiss an action on the ground that the allegations in the complaint fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  In considering a motion to dismiss, the court assumes that the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences.  *Hazewood v. Foundation Financial Group*, *LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as

---

[4] Crestwood is comprised of two neighborhoods located within five miles of the Project site. The Citizens Advisory Council represents 23 communities within the City of Birmingham. (Doc. 24 at ¶¶ 6-8).

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

Here, the Plaintiffs have alleged violations of NEPA.  Because NEPA does not provide for a private right of action, the Plaintiffs have filed suit under the Administrative Procedures Act ("APA"), which confers a right to judicial review upon any person "adversely affected or aggrieved" by agency action.  5 U.S.C. § 702.  To proceed under the APA, the Plaintiffs must show that "there has been a final agency action adversely affecting [them]" and that, as a result, their injury "falls within the 'zone of interests' of the statutory provision" they claim was violated, in this case NEPA.  *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)); *see* 5 U.S.C. § 702.  The "zone of interests" test "is not especially demanding" and forecloses suit "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) (quotation marks and citations omitted).

ALDOT has moved to dismiss the Plaintiffs' complaint for lack of standing, arguing that the Plaintiffs' "real concerns do not fit within NEPA's zone of interests."  (Doc. 47 at 30).  Although ALDOT has characterized the issue as one

of standing, "[w]hether a plaintiff comes within the 'zone of interests' is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 134 S. Ct. at 1387. In other words, the proper inquiry is whether the plaintiff "has a cause of action under the statute." *Id.* That inquiry is not a matter of standing, because "the absence of a valid … cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Id.* at 1387 n.4 (internal quotation marks and citations omitted). The inquiry is "a straightforward question of statutory interpretation." *Id.* at 1388; *see also City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1273-74 (11th Cir. 2015).

NEPA is a procedural statute that was enacted "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation …." 42 U.S.C. § 4321. NEPA's goals include ensuring "safe, healthful, productive, and esthetically and culturally pleasing surroundings"; attaining "the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended

consequences"; preserving "important historic, cultural and natural aspects of our national heritage"; and achieving "a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities." 42 U.S.C. § 4331(b).  Although NEPA's goals are stated "in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment."  *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983) (emphasis in original) (footnote omitted).  Accordingly, "the terms 'environmental effect' and 'environmental impact' in [NEPA should] be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Id.* at 774.

Here, ALDOT argues that the Plaintiffs' concerns do not fall within NEPA's zone of interests because they have not alleged "any claims of environmental injury or harm in connection with the Project." (Doc. 47 at 32).  ALDOT notes that "[n]ot one of the Plaintiffs' individual Declarations in Support of Standing claim that the Project might injure, harm or adversely affect the natural or physical environment" and that the Plaintiffs are instead concerned about "the 'ongoing revitalization' in downtown Birmingham and the 'tax money at stake.'"  (*Id.* at 30-31).  ALDOT asserts that such "potential economic impact[s]" are insufficient to

satisfy NEPA's zone of interests test.  (*Id.* at 31(citing *Maiden Creek Associates, L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 194 (3d Cir. 2016)).

The Plaintiffs respond that while they "do couch the end results about which they are concerned in terms of economic impacts, those economic impacts are secondary, and a direct result of physical changes the Project would make to the built environment of their neighborhoods and downtown Birmingham."  (Doc. 51 at 23-24).  They argue that they are "concerned about the 'physical environment' that the Project will create in and near their own neighborhoods and businesses, placing them squarely in NEPA's zone of interests."  (*Id.* at 24).

Having carefully scrutinized the Plaintiffs' complaint, the court is satisfied that the Plaintiffs' concerns do fall within NEPA's zone of interests.  To be sure, the injuries they have identified in their complaint are primarily economic, but they have alleged other injuries as well.  They allege: "ALDOT proposes to turn the present six lanes [of the CDB Bridge] to a ten lane highway creating one solid elevated bridge in the current footprint of I-20/59. This would turn an ugly elevated highway into a virtual cave totally covering with concrete the area from the Criminal Justice Center, Art Museum, [and] Alabama School of Fine Arts over to the Birmingham Jefferson Civic Center, the Sheraton Inn and the new Uptown project."  (Doc. 1 at ¶ 27).  Without adopting the Plaintiffs' description of the proposed highway as a "virtual cave," their allegation identifies a negative

aesthetic impact caused by the Project, and arguably safety concerns as well. The Plaintiffs also allege in their complaint that "[p]roposed ramps to the I-65/I-20/I-59 interchange from 11th Avenue North create a new physical barrier to the Fountain Heights neighborhood" and that "[t]he barrier effect from 11th Avenue North and the viaduct cross street severances restricts land use access between the elevated freeway and 11th Avenue North ramps." (Doc. 1 at ¶ 30). These alleged new barriers will be created by the Project. The Plaintiffs also raise concerns about the impact of the Project on traffic flow. (*Id.* at ¶¶ 28-29). Finally, all but one of the Plaintiffs live within one mile of the Project—Plaintiff Shirley Ellis lives just 100 yards from the Project—and they have all alleged that their properties will be negatively affected by the Project. It is a close call, but the court is satisfied that the Plaintiffs' concerns are consistent with NEPA's zone of interests and that their complaint is not subject to dismissal under Rule 12(b)(6).

In reaching this conclusion, the court also takes note of the procedural history of this case. After the Plaintiffs filed their complaint, ALDOT answered the complaint without raising any Rule 12(b)(6) or "standing" issues. (Doc. 19). The Plaintiffs, ALDOT, and the FHWA then jointly moved the court to enter a proposed case management order, advising the court that they anticipated that the court would "resolve the merits of this case on cross-motions for summary judgment based upon the facts in the FHWA's Administrative Record." (Doc. 22

at 2).  The proposed case management order set forth a deadline for amending the pleadings; deadlines for the submission of the administrative record and the filing of any motions concerning the same; and deadlines for the filing and briefing of cross-motions for summary judgment.[5]  (*Id.* at 3-5).  The court granted the parties' motion and entered the case management order.  (Doc. 23).  ALDOT did not amend its answer, nor did it move to dismiss the complaint for lack of "standing."  Instead, the case proceeded as the parties had anticipated.  The entire Administrative Record is now before the court, along with extensive cross-motions for summary judgment based on the facts in that record.  Given this posture, the court is not inclined to dismiss the case without addressing the merits.

## IV.  THE MOTIONS FOR SUMMARY JUDGMENT

### A.    Review Standards

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party is authorized to move for summary judgment on a claim or defense asserted by or against the movant.  Under Rule 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The fact that each party has filed a motion for summary judgment does not alter the Rule 56

---

[5]  The proposed case management order also included a deadline for the Plaintiffs to file "any declarations by which they intend to establish United States Constitution Article III standing." (Doc. 22 at 3-4).  The Plaintiffs filed such declarations, and ALDOT has not challenged their Article III standing.

standards applicable to each one.   "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Products, Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338-39 (Fed. Cir. 2001)).

As noted, the Plaintiffs have brought their claims under the Administrative Procedures Act.   Under the APA, "courts are to decide, on the basis of the record the agency provides, whether the [agency's] action passes muster under the appropriate APA standard of review."[6]   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).   Courts routinely use summary judgment to review agency decisions.   *See Mahon v. USDA*, 485 F.3d 1247, 1253 (11th Cir. 2007).

Pursuant to the APA, the reviewing court examines whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   "This standard requires substantial

---

[6] In the Plaintiffs' brief, they quote extensively from comments made by ALDOT Director John Cooper in an interview in August 2015 and by the Secretary of the U.S. Department of Transportation in March 2016. (Doc. 41 at 16-17, 28).   These comments post-date the issuance of the FONSI in June 2015 and are not part of the Administrative Record.   "Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision."   *Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1120 (11th Cir. 2013) (quotation marks and citation omitted).   Rather, "[t]he focal point for judicial review should be the administrative record."   *Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).

deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008). This provides the court with "very limited discretion to reverse an agency decision." *City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005). "The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *Fund for Animals*, 85 F.3d at 542 (quoting *Skinner*, 903 F.2d at 1539).

## B.    Analysis

The parties' cross-motions for summary judgment address the same issues and arguments. Indeed, the Agencies' motions for summary judgment function largely as responses to the Plaintiffs' motion. Accordingly, the court will consider all three motions for summary judgment together.

The Plaintiffs' core contention is that the Agencies violated NEPA and acted arbitrarily and capriciously when they determined that the Project will have no significant impact on the human environment and approved the Project without preparing an Environmental Impact Statement. They argue that the Environmental Assessment for the Project, on which the Agencies based their Finding of No

Significant Impact, did not adequately consider the impacts of the Project or a reasonable range of alternatives to the Project.   The Agencies argue just the opposite.   The Agencies argue that they reasonably concluded that the Project will have no significant environmental impact and that an EIS is not required, and that the EA adequately considered the Project's impacts and evaluated a reasonable range of alternatives.   They argue that their conclusions were not arbitrary or capricious.

### 1.   Project Impacts

As noted above, NEPA requires a federal agency to prepare an EIS when a "major" federal action is expected to "significantly" affect the quality of the human environment.   42 U.S.C. § 4332(2)(C).   In broad terms, "whether a major federal action will 'significantly' affect the quality of the human environment" requires the relevant agency "to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." *Hanly v. Kleindienst*, 471 F.2d 823, 830-31 (2d Cir. 1972).   This analysis "requires considerations of both context and intensity."   40 C.F.R. § 1508.27.   "Significance varies with the setting of the

proposed action" and "[b]oth short- and long-term effects are relevant." *Id.* §

1508.27(a). "Intensity" concerns "the severity of impact." *Id.* § 1508.27(b). CEQ

regulations identify ten factors to be considered in evaluating intensity:

> (1) Impacts that may be both beneficial and adverse. …
>
> (2) The degree to which the proposed action affects public health or safety.
>
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
>
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. (6) The degree to which the action may establish a precedent for future actions with significant effects ….
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. …
>
> (8) The degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources.
>
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat ….
>
> (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.*

Eleventh Circuit precedent provides four criteria a reviewing court considers in determining whether an agency's decision not to prepare an EIS was "arbitrary and capricious":

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1320 (S.D. Ala. 2002) (quoting *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998)). A significance determination "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. In assessing whether the agency's determination was "arbitrary or capricious," the court's role is to determine whether the decision "'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Here, the Plaintiffs point to a number of impacts that allegedly make the Project significant and require the preparation of an EIS. They point to the alleged "social, economic and health" effects of the Project on the CDB community, the cumulative impacts of the Project, the alleged "high degree" of controversy and uncertainty about the Project, and the regional significance of the Project. They

22

argue that these alleged impacts were either ignored or inadequately addressed in the EA.  The Agencies respond that they took a "hard look" at the Project's potential impacts in preparing the EA and that the Plaintiffs have not demonstrated that their conclusions were arbitrary or capricious.  For the reasons that follow, the court agrees with the Agencies.

### a.    Social, Economic and Health Effects on the Community

The Plaintiffs argue that the Agencies refused to address "[three] expert studies provided … by the City or any other source information necessary to evaluate the social, economic and health effects [of the Project] on the communities that surround the Project."[7]  (Doc. 41 at 27-28).  They assert that "[t]hese factors are not addressed in the EA or the FONSI at all." (*Id.* at 28).  ALDOT retorts that "[t]he EA and FONSI each reflect detailed analyses of the Project's 'social, economic and health effects,' including consultation with persons and agencies with jurisdiction over these types of issues."[8] (Doc. 47 at 42).

---

[7] The three studies are: "The I-20/59 Viaduct in Downtown Birmingham, Alabama: Economic Development and Transportation Review," prepared for REV Birmingham and City of Birmingham (Goody Clancy, *et al.*, Apr. 2014) (the "Goody Clancy Study") (R. 11545-95); "Concept Feasibility Review for Lowering I-20/I-59: Birmingham, Alabama," prepared for Operation New Birmingham (Parsons Brinckerhoff, Jan. 2009) ("Parsons Brinckerhoff Study") (R. 893–950); and "Birmingham City Center Master Plan Update," prepared for the City of Birmingham, Alabama (Urban Design Associates, *et al.*, Oct. 2004) ("Master Plan Update") (R. 838–91).

[8] The FHWA does not respond to the Plaintiffs' argument as such, but does argue that "the EA and FONSI took a hard look at the environmental impacts of the [Project]."  (Doc. 48-1 at 30). The FHWA also discusses the Agencies' consideration of the Project's potential impacts on noise, traffic flow, crime, and connectivity (barrier) issues.  (*Id.* at 32-42).

The court first notes that potential socioeconomic impacts alone do not trigger a requirement to prepare an EIS. *See Image of Greater San Antonio, Tex. v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978).  NEPA requires preparation of an EIS only when a proposed action is expected to significantly affect the quality of the "human environment."  42 U.S.C. § 4332(2)(C).  CEQ regulations define the term "human environment" as the "natural and physical environment and the relationship of people with that environment."  40 C.F.R. § 1508.14.  "This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement."  *Id*.  As another court in this district noted, "NEPA's threshold requirement is that of a primary impact on the *physical* environment."  *Comm. to Save the Fox Bldg. v. Birmingham Branch of Fed. Reserve Bank of Atlanta*, 497 F. Supp. 504, 511 (N.D. Ala. 1980) (emphasis in original).

In any event, the EA and the FONSI *do* address the Project's "social, economic and health" effects.  Among other effects, the EA and FONSI address: land use and socioeconomic impacts (R. 13537-38, 13852, 13968-69); cultural and historic resources (R. 13539, 13854, 13960-66); management of hazardous materials (R. 13539, 13840-44, 13854); air quality (R. 13853); noise (R. 13537, 13853); and traffic impacts (R. 5213, 13528, 13535, 13851).  The Agencies' evaluation of these effects is supported by detailed studies in the Administrative

Record, including: Environmental Justice Evaluation (R. 13587-634, 13910-36); Right-of-Way Acquisition Study and Relocation Assistance Plan (R. 13898-909); Cultural/Historic Resources Studies (R. 13942-47); Hazardous Materials and Foundry Waste Report (R. 13948-54); Air Quality Analysis Technical Report (R. 13971–14002); Noise Analysis Technical Report (R.14003-66); and Traffic Study/Interchange Modification Study (R. 4809-86, 5213). The FONSI also imposes Environmental Commitments on the Project that include decorating ramp walls with murals and installing lighting, sidewalks, pavers, and other landscaping features underneath the new bridge. (R. 13530-31, 13603-04). In addition to all of the above, during the public involvement process ALDOT received the comment that there will be "negative economic impacts" from the Project. ALDOT responded: "It is expected that residences and businesses in the area will benefit from the bridge replacement, access and traffic operational improvements through the CBD." (R. 14075). The Plaintiffs have not shown that this conclusion was arbitrary or capricious. Their assertion that the EA and FONSI do not address social, economic and health factors "at all" is simply not accurate.

As concerns the Plaintiffs' complaint that the EA does not address three expert studies provided by the City of Birmingham, the court observes that although the studies are not explicitly addressed in the EA, all three studies are included in the Administrative Record. The Administrative Record reflects that

the Parsons Brinckerhoff Study, which evaluated the feasibility of lowering the section of I-59/20 that runs through the Birmingham CDB, was reviewed by ALDOT's engineering consultant and was found to contain "several inaccuracies" and "design flaws." (R. 3778-79). The Administrative Record also reflects that the Goody Clancy Study, which was published more than a year before the EA was issued, was based on a review of the Project design as it existed in November 2013. (*See* R. 11587). The final Project design that was approved in 2015 addressed many of the issues cited in the Goody Clancy Study. (*See* R. 11583-84, 13528-35). Finally, the Plaintiffs have not shown how any of the three studies renders the Agencies' factual determination of no significant environmental impact arbitrary and capricious. In the end, the Agencies "must have discretion to rely on the reasonable opinions of [their] own qualified experts," which is what they did here. *Marsh*, 490 U.S. at 378.

In sum, the Administrative Record is replete with evidence that the Agencies took a "hard look" at the "social, economic and health" effects of the Project and addressed them in the EA and FONSI.

### b.    Cumulative Impacts

The Plaintiffs assert that the EA "contains a limited and legally insufficient analysis of cumulative impacts." (Doc. 41 at 32). They contend that "[a] legally-sufficient analysis would have to take into account the impacts caused to the

26

human environment beginning with the original construction of the section of highway subject of the Project in the 1960s." (*Id.* at 37). They argue that the EA addresses "only the impacts of the Project in relation to the *status quo*." (Doc. 51 at 19). The Agencies do not dispute that NEPA requires evaluation of cumulative impacts, but argue that the Plaintiffs "misunderstand how an action's cumulative effects are measured" and are "making the wrong comparison" in their analysis. (Doc. 47 at 31; Doc. 48-1 at 32). Again, the court agrees with the Agencies.

The cumulative impact of an action is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions …." 40 C.F.R. § 1508.7. This involves consideration of the "context" of the proposed action. As the Second Circuit has observed:

> Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change. Absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored. For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless public park.

*Hanly*, 471 F.2d at 831. Here, the "context" or "existing environment" of the Project includes an elevated bridge that runs through the Birmingham CBD. Even the Plaintiffs acknowledge that the "relevant context" of the Project is "that of previous road construction and expansion." (Doc. 51 at 16). The Project proposes

to construct a new CDB Bridge in the footprint of the existing bridge.  The proper cumulative impacts comparison, therefore, is between the status quo of leaving the existing bridge in place and the cumulative or incremental environmental impact resulting from construction of the new bridge.

The Plaintiffs point to all of the negative impacts that they contend have been caused by the construction of the existing CDB Bridge.  They argue:

> Beginning with construction of the highway in the 1970s [sic], the lay of the land has been drastically changed, drainage patterns affected, and air pollution and noise exponentially increased.  Barriers have been erected between the northern neighborhoods and CDB which they once abutted, as well as between those neighborhoods themselves.  The residents and businesses in those neighborhoods have been effectively cut off from the city center and from the economic development that should logically have sprung from their proximity to the city center but for the gaping wound created by the I-59/20 viaduct.

(Doc. 41 at 22).  Even assuming that all of these adverse effects exist, Congress enacted NEPA "to require agencies to assess the future effects of future actions." *Metro. Edison Co.*, 460 U.S. at 779.  As the Plaintiffs themselves acknowledge, NEPA "does not create a remedial scheme for past federal actions."  *Id.* If the Project does not go forward, all of the barrier and other effects identified by the Plaintiffs will still exist.  They are existing—not future—effects of past federal action.

Moreover, the Administrative Record reflects that the Agencies did, in fact, take into account the potential cumulative impact of the Project on the existing

"barrier effect."   In response to community concerns, ALDOT committed to "maintain and improve access between the [Birmingham CBD] and the Community of Fountain Heights."  (R. 7510).  The initial Project design "closed several roads between the CBD and neighborhoods in north Birmingham," but in response to public comments the design was "revised to maintain pedestrian and vehicular access along 11th Avenue North, 15th Street North, 16th Street North, and 28th Street North." (R. 14072).  The EA notes that the project "will not block the [Fresh Water Land Trust Red Rock Ridge and Valley Trail System] and the sidewalks on city streets beneath the I-59/20 bridge will be reconstructed to improve connectivity and accommodate pedestrian access to and from the Birmingham CBD."  (R. 13848).  The new bridge will also require fewer support piers, which will allow more room for future trails.  (*Id.*)

The Agencies concluded that the Project "should not impact development and neighborhood redevelopment in downtown Birmingham" and "is expected to improve access to homes and businesses in the area."  (R. 14073-74).  Overall, the Agencies' conclusions in the EA and FONSI reflect that the Project will have a positive incremental impact on the human environment as compared to the status quo of the existing bridge.  Even if the Plaintiffs disagree with the Agencies' conclusions, they have not shown that the Agencies failed to take a hard look at the Project's cumulative impacts or that the Agencies' conclusions are arbitrary and

capricious.  They  certainly  have  not  demonstrated  that  the  Project  will "significantly increase" the size of the "gaping wound" they claim was created when the existing bridge was constructed years ago, as they proclaim in their brief (with no corresponding citations to the Administrative Record).  (Doc. 41 at 22).

### c.       Controversy and Uncertainty

In their reply brief, the Plaintiffs argue broadly that the Project is "highly controversial"  and  that  the  possible  effects  of  the  Project  on  the  human environment are "highly uncertain."[9]   (Doc. 51 at 14-15) (citing 40 C.F.R. § 1508.27(b)(4) & (b)(5)).   The Agencies respond that the Project is not "highly controversial" and that its effects are not "highly uncertain."  (Doc. 52 at 16-17; Doc. 53 at 17-18).

As used in the CEQ regulations, "controversial" refers to "cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use."  *Town of Cave Creek, Az. v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quotation marks and citation omitted); *see also Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702

---

[9] In their initial brief, the Plaintiffs asserted that the EA is "devoid of any traffic analysis" on U.S. Highway 31 and I-65, which "siphon traffic onto and off of the 3.5-mile stretch of I-59/20 being reconfigured."  (Doc. 41 at 23).   They argued that the "degree of uncertainty and controversy" about the traffic impacts on these roads "should have triggered an EIS."  (*Id*.)   In response, the FHWA cited an expert study performed by Volkert, Inc., for ALDOT, which analyzed the "operational effects" of the proposed Project and included morning and afternoon traffic numbers for U.S. 31 and I-65.  (Doc. 48-1 at 34; *see* R. 2392, 2421, 2426, 2430).  The Plaintiffs did not address this evidence in their reply brief.

F.3d 1156, 1181 (10th Cir. 2012).  To require the preparation of an EIS, "certainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter."  *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975). Otherwise, "opposition, and not the reasoned analysis set forth in an [EA], would determine whether an [EIS] would have to be prepared. The outcome would be governed by a 'heckler's veto.'"  *North Carolina v. FAA*, 957 F.2d 1125, 1133-34 (4th Cir. 1992) (citations omitted); *Hillsdale*, 702 F.3d at 1181 ("Even if 90% of the comments to the [EA] were negative, this merely demonstrates public opposition, not a substantial dispute about the 'size, nature, or effect' of the intermodal facility.").

Here, the Plaintiffs assert that the Project is highly controversial because they and "numerous other members of the community" have raised concerns about the effect of the Project on their neighborhoods and redevelopment in the City of Birmingham as a whole.[10] (Doc. 51 at 14). Such public opposition, without more, does not constitute a substantial dispute about the "nature, size, or effect" of the Project so as to trigger the need for an EIS.

---

[10] The Plaintiffs also cite a letter from Birmingham Mayor William Bell which they claim raises the same concerns. (Doc. 51 at 14, citing R. 5175).  The letter is dated May 12, 2014, a year before the EA and FONSI were issued.  Contrary to the Plaintiffs' characterization of the letter, it identifies no substantial controversy about the Project.  In the letter, Mayor Bell expresses his appreciation to ALDOT for "listen[ing] to the past concerns of the City and the community and ma[king] changes to the proposed design to alleviate most of those concerns."  (R. 5175).  Mayor Bell also notes that ALDOT's "solution" appears to be "the best way to accomplish" the task of replacing the CDB Bridge. (*Id.*)

As concerns the Plaintiffs' contention that the effects of the Project are highly uncertain, the Plaintiffs simply repeat their unfounded assertion that the Agencies made no effort to determine the Project's socioeconomic effects.  (Doc. 51 at 15).  As discussed above, the Agencies did address the Project's potential social, economic, and health effects, and their conclusions were supported by numerous studies in the Administrative Record.

### d.   Regional Significance

The Plaintiffs also assert in their reply brief that the Administrative Record is "replete with evidence of the Project's significance," citing random comments from ALDOT and FHWA representatives that the Project will have "regional significance" and be "regionally significant."  (Doc. 51 at 6-7).  They argue that "[i]f the Project is as good—and as 'regionally significant'—as the [Agencies] claim, then its impact also rises to the level of significance required to trigger the need for an EIS for the Project."  (*Id.* at 9-10).  The Plaintiffs' argument misses the mark for a number of reasons.

First, statements to the effect that the Project will have "regional" significance say nothing—and express no conclusions—about the environmental significance of the Project, which is what determines the need for an EIS.  *See* 42 U.S.C. § 4332(2)(C).

Second, while NEPA does require assessment of a Project's beneficial impacts as well as its adverse impacts, a project's anticipated beneficial impacts do not automatically give rise to the need for an EIS. "It would be anomalous to conclude that an [EIS] is necessitated by an assessment which identifies beneficial impacts while forecasting no significant adverse impacts, when the same assessment would not require the preparation of an [EIS] if the assessment predicted no significant beneficial effect." *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 (6th Cir. 1995); *see also Hanly*, 471 F.2d at 830-31 (holding that a project's "adverse" environmental effects are the relevant factors to review in deciding whether the project will "significantly" affect the quality of the human environment).

Third, the significance of the Project's environmental impacts—whether beneficial or adverse—is a factual determination within the Agencies' discretion. *Marsh*, 490 U.S. at 376-77. Absent a showing that the Agencies made a clear error in judgment—a showing the Plaintiffs have not made—their determination that the Project will have no significant impact on the human environment will not be set aside.

## 2. Alternatives

The Plaintiffs' other core argument is that the Environmental Assessment for the Project did not consider a full range of alternatives. CEQ regulations require

an EA to contain a "brief discussion[]" of alternatives to an agency's proposed action. 40 C.F.R. § 1508.9(b).  "NEPA does not impose any minimum number of alternatives that must be evaluated." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012).  Instead, NEPA requires agencies to consider a range of alternatives "'sufficient to permit a reasoned choice.'"  *C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569, 1574 (11th Cir. 1988) (quoting *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973)).  "[T]he range of alternatives that must be discussed is a matter within an agency's discretion." *Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1558 (2d Cir. 1992) (citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551–552 (1978)).

The concept of alternatives is also "bounded by some notion of feasibility." *Vermont Yankee*, 435 U.S. at 551.  An agency need not analyze alternatives that it has in good faith rejected as impractical, ineffective, or not likely to be approved. *See WildEarth Guardians v. Nat'l Parks Serv.*, 703 F.3d 1178 (10th Cir. 2013); *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Hwy. Admin.*, 756 F.3d 447, 469-70 (6th Cir. 2014); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 935 F. Supp. 1556, 1576 (S.D. Ala. 1996) (alternative that "would have more than doubled the cost of the construction project and … would have posed substantial logistical problems for construction" was not reasonable).

Here, the Plaintiffs argue in their initial brief that ALDOT considered only two alternatives—a "No-Build Alternative" and a "Build Alternative"—and did not consider the public's requests that it study "the alternative[s] of re-routing or sinking the highway." (Doc. 41 at 30). In their reply brief, the Plaintiffs refine their argument that ALDOT did not consider the re-routing and sinking alternatives, arguing that ALDOT did not complete a "formal study" of either alternative and did a "poor job" of showing why the two alternatives were not feasible. (Doc. 51 at 21-22). They also argue that ALDOT did not consider another alternative: "fixing the road first and relocating it later." (*Id.*) In response, the Agencies argue that they considered a reasonable range of alternatives to the Project, noting that the EA itself addresses four—not two—alternatives and that they did, in fact, study the alternatives of re-routing and sinking the highway. Again, the court agrees with the Agencies and finds that they considered a reasonable range of alternatives to the Project, thereby satisfying NEPA.

As noted, the stated purpose of the Project is "to address the structurally deficient bridge along I-59/20 and to improve the traffic operations and access" through the Birmingham CBD. (R. 13847). Although the Plaintiffs are technically correct that the EA addresses only "No-Build" and "Build" alternatives, within that framework the Agencies evaluated a total of four alternatives: the No-Build Alternative and the First, Second, and Third Build Alternatives. (R. 13850-51).

The EA considered and rejected the No-Build Alternative: leaving the CDB Bridge as it currently exists and continuing to perform routine maintenance as needed.  The EA found that this alternative would "not address the structurally deficient bridge" and would "not improve the traffic operations and access" through the CBD.  (R. 13850).

The EA also rejected the First Build Alternative: replacing the decks of the existing bridge but leaving the substructure in place. The EA found that redecking "did not address the traffic operational deficiencies, access concerns or aesthetics." (R. 13850).

The EA then considered the Second Build Alternative: switching to a segmental concrete bridge to decrease noise and improve aesthetics, adding auxiliary lanes on the bridge, modifying interchanges, and closing several surface streets to through-traffic.  The EA eliminated the Second Build Alternative from further consideration because it "removed access to the Fountain Heights and Norwood Communities from the Birmingham CBD, removed access to businesses, and would impact development along 11th Avenue North."  (R. 13850-51).

Finally, the EA considered the Third Build Alternative, a modification of the Second Build Alternative with fewer street closures.  The Third Build Alternative (with minor changes) was accepted as the final Project design.  (R. 13528, 13851).

In addition to considering the four alternatives discussed in the EA, all of which kept the CDB Bridge in its existing footprint, the Agencies considered moving the highway north to the Finley Boulevard corridor (two alternative designs) and sinking the highway to below street level.  (R. 5051-5109).  It is simply not true, as the Plaintiffs assert in their briefs, that the Agencies did not study either of these alternatives.  As previously noted, ALDOT retained an independent consultant to study both of these alternatives and assess their feasibility.  (R. 4456).  Based on the consultant's findings, ALDOT determined that the relocation and sinking alternatives were too costly (each costing in excess of one billion dollars) and required unacceptably long timeframes to implement (each taking more than two decades to complete).  (R. 5104–5105).  ALDOT discussed the reasons for rejecting these alternatives at a Public Involvement Meeting in March 2014.  (R. 5051-109).  The reasons were also discussed in the FONSI.  (R. 13533-34, 14073).  Excessive cost and delay are both permissible reasons to remove an alternative from further NEPA study, as the Agencies did here.  *See Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996) (excessive cost); *Porter Co. Chapter of Izaak Walton League of Am., Inc., v. Atomic Energy Comm'n*, 533 F.2d 1011, 1017 n.10 (7th Cir. 1976) (delay to implement).

To the extent the Plaintiffs argue that the Agencies were required to complete a "formal study" of the relocation and sinking alternatives, NEPA does not impose such a requirement.  The Supreme Court has stated that NEPA allows an agency to "exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence …."  *Vermont Yankee*, 435 U.S. at 544 (citation omitted).  "There will always be more data that could be gathered; agencies must have some discretion to decide when to draw the line and move forward with decisionmaking."  *Town of Witnthrop v. FAA*, 535 F.3d 1, 11 (1st Cir. 2008).  The court also notes that the "PowerPoint presentation" prepared by ALDOT's consultant, which the Plaintiffs deride in their reply brief, was a 59-page presentation containing cost estimates, maps, and timelines.  (R. 5051-109).  The presentation is certainly reflective of a study of the relocation and sinking alternatives, whether formal or not.

To the extent the Plaintiffs argue that the Agencies did a "poor job" of explaining why the relocation and sinking alternatives would cost too much or take too long, their argument is simply reflective of their disagreement over how ALDOT has chosen to allocate its resources.  They argue that the Agencies "do not explain why they have the budget for a $450 million project but not a $1.1 or $1.5 billion project, or why this project should not be prioritized over other significant and even more expensive projects being built in this area …."  (Doc. 51 at 22).

Courts, however, do not second-guess how agencies distribute their resources among competing priorities. *See Concerned Citizens Alliance., Inc. v. Slater*, 176 F.3d 686, 705-06 (3d Cir. 1999) (upholding an agency that rejected a transportation alternative for its "excessive construction . . . costs"); *see also Laird v. Tatum*, 408 U.S. 1, 15 (1972) (Courts do not preside as "monitors of the wisdom and soundness of Executive action ….").

Moreover, in a letter to Plaintiff James Clark in June 2014, ALDOT explained in detail why it did not have the financial resources to relocate I-59/20 to the Finley Boulevard corridor (or, by extension, why it did not have the resources to sink the highway):

> Our studies have … indicated that relocating the interstate to a new corridor to the north could cost as much as $1.5 billion dollars. The present cost of the bridge replacement project is estimated to be between $350 to $450 million dollars. Our Department currently allocates $150 million dollars per year that we are able to spend on new capacity projects. Much of the cost for the present bridge replacement will come from one year's allocation of interstate maintenance funds (the funds used to maintain the interstates across the state). The remaining funds will be borrowed under our present funding constraints. The Department of Transportation does not currently have the resources to borrow the amount of money required to move [I-59/20] to the Finley Boulevard Corridor or to allocate that amount of future revenue to one corridor, given the needs all over the state.

(R. 5256).[11]  Given that ALDOT's letter was written to one of the Plaintiffs in this action, it is disingenuous for the Plaintiffs to now claim that the Agencies did not adequately explain why the Plaintiffs' preferred alternatives are not feasible.

The Plaintiffs also point to yet another alternative they argue the Agencies should have considered: fixing the CDB Bridge now and relocating the highway at a later time.  NEPA, however, does not require an agency to consider "every conceivable permutation" of an alternative.  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004).  Here, the Agencies considered and rejected the separate alternatives of replacing the bridge decks and leaving the substructure in place (the First Build Alternative) and relocating the interstate. Nothing in NEPA required the Agencies to consider permutations of both alternatives together.

The Plaintiffs make one additional argument that deserves attention.  The Plaintiffs argue that "[i]nstead of evaluating other viable alternatives, simultaneously with their decision to do an EA, ALDOT also predetermined that they would reach a finding of no significant impact (FONSI)." (Doc. 41 at 31).  In support of their argument, the Plaintiffs point to a few isolated project notes and schedules from 2012 and 2013 that reference completion and approval of a FONSI.

---

[11] In that same letter, ALDOT also explained: "The Department has spent time studying [moving the interstate to the Finley Boulevard Corridor] and our findings show that such a project could take anywhere from 20 to 30 years to construct.  For these reasons, we have always said that we don't have the luxury of having that time to construct a new corridor."  (R. 5256).

(*Id.* at 32, citing R. 1586, 1965, 1975, 2864).   ALDOT's anticipation that the FHWA would issue a FONSI for the Project, however, does not equate to a predetermined outcome.   A claim of predetermination carries a high burden of proof, requiring evidence that the agency "*irreversibly and irretrievably* committed itself to a plan of action that [was] dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency … completed that analysis." *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 714-15 (10th Cir. 2010) (emphasis in original); *cf. Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 175 (2004) ("Allegations of government misconduct are easy to allege and hard to disprove, so courts must insist on a meaningful evidentiary showing." (internal quotation marks and citation omitted)).   Having reviewed the Administrative Record, the court finds no evidence that ALDOT's decision to proceed with the Third Build Alternative was dependent upon the FHWA's issuance of a FONSI, much less that ALDOT irreversibly and irretrievably committed itself to that alternative before the EA was complete.   The court also finds no evidence that either the EA or the FONSI are sham documents or that the Agencies did not give meaningful consideration to other alternatives to the Project.

### 3.     Decision

For all of the reasons discussed above, the court is more than satisfied that the Agencies took a hard look at the potential impacts of the Project on the human environment and made a convincing case for their Finding of No Significant Impact.  The court is also satisfied that the Agencies evaluated a reasonable range of alternatives to the Project.  The Agencies fully complied with NEPA in their Environmental Assessment of the Project, and their Finding of No Significant Impact, including their determination that an Environmental Impact Statement was not required, was neither arbitrary nor capricious.   Accordingly, the Plaintiffs' motion for summary is due to be denied and the Agencies' cross-motions for summary judgment are due to be granted.

## V.  CONCLUSION

Based on the above, ALDOT's motion to dismiss for lack of standing (doc. 46) will be DENIED; the Plaintiffs' motion for summary judgment (doc. 40) will be DENIED; ALDOT's alternative cross-motion for summary judgment (doc. 46) will be GRANTED; and the FHWA's cross-motion for summary judgment (doc. 48) will be GRANTED.   A separate order consistent with this opinion will be entered.

**DATED** this 16th day of November, 2016.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge